UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JERRELL MICHAEL BROWN,　　　　　　　　　　CIVIL NO. 13-1058 (MJD/JSM)

　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　REPORT AND RECOMMENDATION

JOHN KING,
KENT GRANDLIENARD,
DAVID REISHUS,
TAMMY WHERLEY,
RICARDO LOPEZ, and
VINCENT KRENTZ,

　　　Defendants.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon plaintiff's Motion for Temporary Restraining Order [Docket No. 3].

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(A), (B) and Local Rule 72.1(c).

I.　　**INTRODUCTION**

Plaintiff Jerrell Michael Brown ("Brown") is currently incarcerated at Minnesota Correctional Facility Oak Park Heights ("MCF-OPH"). Brown filed a Complaint alleging a violation of his civil rights under 42 U.S.C. § 1983 against officials at MCF-OPH and seeking injunctive relief and a temporary restraining order directing that he be transferred

to a prison outside of Minnesota. Complaint, p. 7 [Docket No. 1].[1] The Complaint,[2] alleged as follows: On March 10, 2010, Brown entered Minnesota Correctional Facility ("MCF-St. Cloud") located in St. Cloud, Minnesota, and three days later was threatened with a shank and death. See Complaint, ¶¶ A-C. The individuals who threatened Brown were family members of the victim in his criminal case and members of the Minnesota "Squad" prison gang. Id., ¶ C. As a result of this threat, Brown ran to his cell and reported the incident to a correctional officer. Id., ¶¶ C-E. Brown was placed in administrative segregation and was told that he would be sent to MCF-OPH. Id., ¶¶ G-I. Brown found out that one of the victims' family members resided at MCF-OPH, but was nevertheless transferred to this facility on May 10, 2011, and placed into the general population. Id., ¶¶ G-J.

Brown notified defendant Ricardo Lopez that there was a hit on his life by the "Squad" prison gang and a family member of a victim in Brown's criminal case. Id., ¶¶ J-L. Approximately two days later, Brown was warned by other inmates that the victim's

---

[1] On July 19, 2013, Brown filed a motion to supplement his Complaint to add certain events that had taken place after April 25, 2013 and through July 8, 2013 (when he was placed in administrative segregation), and a claim for compensatory damages in the amount of $150 per day against each defendant for mental and emotional distress sustained from being placed in solitary confinement. See Docket No. 16, pp. 3-5. On July 24, 2013, the Court issued an Order granting Brown's motion and directing him to file an amended complaint which met all of the requirements set forth in the Order. See Docket No. 20. On July 29, 2013, Brown filed another motion to amend the complaint [Docket No. 21]. As his motion was dated July 26, 2013, and the proposed first amended complaint [Docket No. 21-1] was signed on July 23, 2013, the Court presumes that the first proposed amended complaint was prepared and signed before Brown received the Court's July 24, 2013 Order allowing him to file an amended complaint adding events through July 8, 2013, and a claim for compensatory damages. On August 1, 2013, Brown filed a letter directed to this Court acknowledging receipt of this Court's July 24, 2013 Order and asking that his July 26, 2013, motion and proposed complaint be treated as "void." [Docket No. 24].

[2] Except as noted, the Court will be citing to the Complaint.

2

family members and the "Squad" gang were getting ready to make a move on him, and the next day he was cornered and forced to choose between going into a cell to fight or being stabbed. Id., ¶¶ M, N. Brown chose to fight and afterwards stayed in his cell, not even coming out to eat. Id., ¶¶ O, P. Brown's refusal to come out of his cell and go back into the general prison population landed him in punitive segregation. Id., ¶¶ R-T, W. Brown gave Lopez the names and details regarding the threat to his life. Id., ¶ V. Receiving no assistance, Brown intentionally received contraband in order to stay in segregation. Id., ¶¶ X, Y. In addition, Brown received an additional 105 days in punitive segregation (from August 23, 2010 through December 29, 2010) for refusing to go into the general prison population. Id., ¶ A2.

On February 18, 2011, Brown was placed into a unit containing "Squad" gang members and on February 19, 2011, he was forced to fight one of the gang members or be jumped by all of the gang members. Id., ¶¶ F2-J2. As a result of the fight, Brown was given 180 days in punitive segregation. Id., ¶ K2. While Brown was told that he was pending an out-of-state transfer, when he inquired about being placed in administrative segregation (pending his transfer), as his punitive segregation period was ending, Brown was told that inmates in punitive segregation were not eligible for out-of-state transfers. Id., ¶¶ L2-P2.

On April 28, 2012, Brown was placed in administrative segregation pending transfer and he waited for the transfer until January 1, 2013, at which time Lopez told him that no transfer request had ever been submitted and that he was going to be forced back into the general population or end up in punitive segregation. Id., ¶¶ Q2-U2. On January 16, 2013, Brown was notified by defendant Tammy Wherley that he had lost his

chance for an interstate transfer after receiving discipline. Id., ¶ V2, Ex. 6. On January 25, 2013, defendant Kent Gradlienard notified Brown that an interstate transfer was still pending. Id., Y2, Ex. 8. On February 5, 2013, Gradlienard denied Brown's grievance seeking a transfer for his safety, on the basis that his request for transfer was canceled due to Brown's conduct and notified Brown that he had only resided for five days in the general population of MCF-OPH and that he had been in segregation since May 16, 2010. Id., ¶ Z2, Ex. 9. Brown was ordered into the general prison population. Id.

On March 1, 2013, defendant John King denied Brown's grievance appeal and stated, "[y]ou appear resigned to avoid general population at all costs. I do not believe you have given a chance at living in population. Offenders talk a lot. By responding to their actions you are giving away your power. I believe it is time for you to give it a try in population because interstate is not on your horizon. I cannot send every defender out of state who thinks they need that." Id., Ex. 10. Subsequently, staff communicated to Brown that he was still being considered for a transfer. Id., ¶¶ B3-D3, Exs. 11, 12, 13.

On April 25, 2013, Brown was told by Lopez that there would be no transfer for him and that he was going to be coming off administrative segregation and going into punitive segregation for refusing to be placed into the general population at MCF-OPH. Id., ¶ E3.

On May 1, 2013, Brown was given a direct order to move to the general population and when he refused to so, he was given 15 days of punitive segregation. See Proposed Supplemental Complaint [Docket No. 17-1], ¶¶ H3-I3, Ex. 17. On May 14, 2013, Brown was again ordered into the general population. Id., ¶ J3. Brown remained in punitive segregation until July 8, 2013, at which time he was placed in administrative segregation after he made a request for such a placement pending his transfer. Id., ¶¶ K3-U3.

4

During this period of time, a transfer was attempted for Brown. Id., Exs. 19-21. Brown sought injunctive relief and a temporary restraining order and asserted that he is imminent danger of serious physical harm. Complaint, ¶¶ F3-G3. He seeks an order transferring him to a prison outside of Minnesota. Id., p. 7.

The matter is presently before the Court upon Brown's motion for a temporary restraining order. See Docket No. 3. Brown asserted that he is imminent danger of serious physical harm. Id. Brown claimed that he has been in segregation for three years, has been waiting for an interstate transfer, and the current warden is determined to place him in the general population, which would be a threat to his security given the threats placed upon his life from a prison gang. Id. Brown seeks to be kept from being placed in the general population pending the outcome of this case, while at the same time avoiding being placed into punitive segregation. Id.

## II.  STANDARD OF REVIEW

"When evaluating whether to issue a preliminary injunction [or a TRO],[3] a district court should consider four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest." Roudachevski v. All-American Care Centers, Inc., 648 F.3d 701, 705 (8th Cir. 2011) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir.

---

[3] Courts in the Eighth Circuit apply the same standards to a request for a preliminary injunction and temporary restraining order. See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project, 877 F.2d 707, 708 (8th Cir.1989) (affirming the district court's application of the Dataphase factors to a motion for a temporary restraining order); Jackson v. Nat'l Football League, 802 F. Supp. 226, 229 (D. Minn. 1992) (concluding that the Dataphase factors apply to requests for temporary restraining orders and preliminary injunctions) (citations omitted).

5

1981) (en banc)). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." West Pub. Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1222 (8th Cir. 1986), cert. denied, 479 U.S. 1070 (1987) (citation omitted). Injunctive relief is an extraordinary remedy and the movant has the burden of establishing the propriety of an injunction. See Roudachevski, 648 F.3d at 705 (citing Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)); see also Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987) (finding that the movant "bore the complete burden of proving that a preliminary injunction should be granted.") (citation omitted). The burden is especially heavy where, as in this case, the moving party seeks not to maintain the status quo, but to obtain relief similar to that which it could obtain after a trial on the merits. See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 486 (8th Cir. 1993) (citation omitted).

### III.  ANALYSIS

#### A.  **Threat of Irreparable Harm**

According to Brown, the threat of irreparable harm in this case is that he will be in imminent danger of serious physical harm if he is placed in the general prison population because of a threat of a gang hit on his life. See Docket No. 3. In support of this assertion, Brown submitted the Declaration of Prentice Wheatley in Support of Plaintiff's TRO and Injunction [Docket No. 7]. Wheatley stated that he was an inmate at the Minnesota Correctional Facility-Stillwater ("MCF-STW"), living in the B-West Living Unit, from 2010 through August, 2011. Id., ¶ 1. As a former gang leader, Wheatley was asked to attend a meeting of gang leaders in B-West Living Unit by Lieutenant Mark Parks to deal with a new gang called the "Squad." Id., ¶ 2. During this meeting, members of

6

the "Squad" gang asked who would intervene in their planned hit against someone called "Hell-Rell," who had killed one of their members by the name of "Ricochet." Id., ¶ 3. On September 1, 2011, Wheatley was transferred to MCF-OPH and lived next Brown. Id., ¶ 4. Brown told him that he was in prison for murdering "Ricochet," a member of the "Squad" gang. Id. On February 24, 2013, Wheatley sent an Offender Kite Form to Warden Gradlienard communicating this information. Id., Ex. A.

Defendants submitted the affidavit of Mark Parks, a Lieutenant at MCF-STW since 2001, who asserted that he had called a meeting to address a May 15, 2010 fight, involving over 50 offenders, which occurred in the B-West Unit of MCF-STW. See Affidavit of Mark Parks [Docket No. 11] ("Parks Aff."), ¶ 3. Lieutenant Parks was at this meeting, but Wheatley was not present. Id. According to Lieutenant Parks, none of the individuals at this meeting discussed a planned assault or hit against anyone called "Hell-Rell" or any other individual. Id. No other meetings were held. Id.

Defendants argued that Brown has not established any threat of irreparable harm by being placed in the general prison population at MCF-OPH, because he has not offered any names of potential assailants, details regarding any threats received, or any other evidence to support his assertions. See Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Temporary Restraining Order [Docket No. 10] ("Defs.' Mem."), pp. 2-3. Defendants discounted Wheatley's representations in that he failed to provide any information regarding the "Squad" gang, its members, or whether any of the members are currently at MCF-OPH. Id., p. 3. In addition, defendants pointed to the fact that the meeting, where "Squad" members allegedly asked at MCF-STW if anyone would intervene in their planned hit, occurred more than two years ago, thereby negating

7

any assertion of a present risk of harm at MCF-OPH.  Id.  Further, defendants relied on Lieutenant Parks' representations that he was present at the meeting in question, Wheatley was not present, and there was no mention at the meeting of a hit.  Id.

This Court finds that Brown has not met his burden of showing that he will suffer irreparable harm absent a restraining order.  Brown has not provided the Court with any evidence that members of the "Squad" gang or the victim's family members are presently being held at MCF-OPH, let alone that the specific individuals who threatened his life were present.  Even Brown admitted in his January 17, 2013 Offender Kite Form that while he knew that the individuals who wanted to put a hit on him were in MCF-STW, he was not sure whether they were at MCF-OPH; instead he claimed that that they were "possibly here now."  See Complaint, Ex. 16.  Moreover, while Brown claimed that he had been forced to fight members of the "Squad" or be killed, he supplied no evidence that such altercations occurred or that he needed any medical treatment as a result of those fights.  At best, the record only shows that he was possibly disciplined for assault and possession of a weapon.  Id., Ex. 7.  The fact that he was disciplined for such conduct does not mean that it was a result of a threat on his life.

As for Wheatley's assertions regarding the hit that he allegedly overheard during the gang meeting authorized by prison officials, these statements are in doubt, as Lieutenant Parks, who authorized and attended the meeting, stated that Wheatley was not present.  Futher, defendants are correct that the Wheatley declaration regarding what occurred in MCF-STW in 2010 does not address whether there is a present threat to Brown at MCF-OPH.

The Court acknowledges that there is evidence in the record that Brown was being considered for an out- of-state transfer based on his repeated requests and at times he was placed in administrative segregation. However, this evidence does not lead this Court to conclude that there is a present risk to him being in the general population.

Finally, Brown has not provided this Court with any evidence or argument as to why he will suffer irreparable harm if he is placed in punitive segregation versus administrative segregation for failing to abide by an order to enter into the general prison population.

In sum, Brown's speculation that he could be harmed at MCF-OPH if placed in the general population does not meet his burden to show a threat of irreparable harm. See Graham Webb Int'l v. Helene Curtis, Inc., 17 F. Supp.2d 919, 924 (D. Minn. 1998) ("Possible or speculative harm is not enough.") (citing Gelco Corp, 811 F.2d at 418; Roberts v. Van Buren Public Schools, 731 F.2d 523, 526 (8th Cir. 1984)); see also Ward v. LeClaire, No. 9:07–CV–0026 (LEK/RFT), 2007 WL 1532067 at *2 (N.D.N.Y. May 24, 2007) ("Plaintiff's request for injunctive relief against future threats or harassment by inmates and/or prison officials is too speculative to meet the irreparable harm requirement. Although Plaintiff claims that he will face future threats and harassment, Plaintiff cannot claim with any certainty how, when, or where he will be retaliated against, or that the retaliation will result in irreparable harm to Plaintiff.") (citation omitted). Therefore, his motion for injunctive relief should be denied. See Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297, 299 (8th Cir. 1996) ("the failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction.").

**B.      Likelihood of Success on the Merits**

Brown has provided to the Court no argument as to why he is likely to prevail on the merits of his Complaint. Neither his Complaint nor his proposed amendments to the Complaint set forth what rights are being violated by defendants' conduct. In a letter to the Court, Brown claimed that his "right to be protected" is based on the due process clause of the Fourteenth Amendment. See Docket No. 4. According to defendants, in essence, Brown is claiming that they have subjected him to cruel and unusual punishment under the Eighth Amendment of the United States Constitution by alleging that they failed to protect him from harm during his incarceration at the MCF-OPH. See Defs.' Mem., p. 10.

A prisoner has a liberty interest, protected by the Due Process clause of the Fourteenth Amendment, to be free from restraint that imposes an atypical and significant hardship in relation to the ordinary incidents of prison life. See Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003) (citing Sandin v. Conner, 515 U.S. 472, 484 (1995)). To sustain an Eighth Amendment claim, Brown "needs to show 'unnecessary and wanton infliction of pain,' as well as a deprivation 'denying the minimal civilized measure of life's necessities.'" Id. at 848 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Given that Brown that has not provided any evidence that he will be harmed at MCF-OPH if placed in the general population, the Court does not find that is likely that he will prevail on showing that defendants' conduct imposes an atypical and significant hardship in relation to the ordinary incidents of prison life or for that matter that he will prevail on any Eighth Amendment claim. Also, to the extent that Brown is complaining about placement in punitive segregation for his refusal to be moved into the general population, such a placement, in of itself, is not an atypical and significant hardship in relation to the ordinary

incidents of prison life. Id. at 847 (noting that the Eighth Circuit "has consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship."); see also Blue v. Fabian, Civil No. 10-87 (DSD/AJB), 2010 WL 5571969, *4 (D. Minn. Dec. 08, 2010) (finding that extended segregation in of itself is not enough to show a violation of the Eighth Amendment) (citing Porth v. Farrier, 934 F.2d 154, 156 (8th Cir. 1991)).

For the reasons set forth above, this Court finds that Brown is not likely to succeed on the merits of his claim.

### C. Balance of the Harms and Public Interest

Brown has not provided sufficient evidence that he will be harmed if placed into the general population of MCF-OPH or placed into punitive segregation for failing to follow orders from prison officials. On the other hand, given his criminal history, permitting Brown to dictate where and how he should be imprisoned would constitute a dangerous intrusion by the Court into prison administration. See Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995) (emphasizing that "in the prison context, a request for injunctive relief must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.") (marks and citation omitted). Such court interference could negatively impact prison resources, compromise security, and lead to the non-rehabilitation of Brown, all of which is not in the public interest. Thus, the Court finds that the balance of the harms and public interest weigh in favor of denying his request for injunctive relief.

### D. Conclusion

In conclusion, based on the Dataphase factors set forth above, this Court finds that Brown's motion for a TRO should be denied.

## IV. RECOMMENDATION

For the reasons set forth above, it is recommended that:

Plaintiff's Motion for Temporary Restraining Order [Docket No. 3] be **DENIED**.

Dated: August 2, 2013

*Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

## NOTICE

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 16, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.